1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SIERRA TELEPHONE COMPANY,              Case No.  1:23-cv-001143-BAM
     INC., et al.,
12                                          **ORDER GRANTING IN PART AND
                    Plaintiffs,             DENYING IN PART DEFENDANTS'
13                                          MOTION TO DISMISS**
            v.
14                                          **ORDER DENYING PLAINTIFFS'
     ALICE B. REYNOLDS, et al.              MOTION FOR PRELIMINARY
15                                          INJUNCTION**
                    Defendants.
16                                          (Docs. 6, 16, 17)

17

18

19          Two motions are pending before the Court in this matter.  On August 1, 2023, Plaintiffs

20   Sierra Telephone Company, Inc. ("Sierra Telephone") and Sierra Tel Internet ("Sierra Internet,"

21   collectively "Plaintiffs") filed their Motion for Preliminary Injunction.  (Doc. 6.)[1]  Defendants

22   filed their opposition, and Plaintiffs subsequently filed their reply.  (Docs. 15, 20.)

23          On August 22, 2023, Defendants Alice B. Reynolds, Karen Douglas, Darcie L. Houck,

24   John Reynolds, and Genevieve Shiroma in their official capacities as Commissioners of the

25   California Public Utilities Commission (collectively "Defendants") filed a Motion to Dismiss

26   pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 17.)  Plaintiffs filed their opposition,

27   ----

28   [1] Documents filed on the CM/ECF docket are referenced throughout this order by their CM/ECF docket number and CM/ECF pagination.

1

1    and Defendants subsequently filed a reply.  (Docs. 23, 24.)  The parties consented to Magistrate

2    Judge jurisdiction over the action for all purposes.  (Doc. 14.)  The Court held a hearing on the

3    two motions on September 27, 2023.  (Doc. 27.)

4          Having carefully considered all of the parties' briefing and oral argument by the parties,

5    and for the reasons detailed below, Plaintiffs' Motion for Preliminary Injunction (Doc. 6) will be

6    DENIED, and Defendants' Motion to Dismiss (Doc. 17) will be GRANTED in part and DENIED

7    in part.  Plaintiffs will be permitted 30 days to amend their complaint consistent with this Order.

8    **I.      BACKGROUND**

9          **A. Parties and Challenge**

10         Sierra Telephone is a small, rural telephone company regulated by the California Public

11   Utilities Commission operating in California's Mariposa County and Madera County and

12   providing voice service and network access services.  (Doc. 1 ¶ 6, Doc. 6-2 ¶ 4.)  Sierra Internet is

13   an unregulated Internet service provider ("ISP") and affiliate of Sierra Telephone.  (Doc. 1 ¶ 7,

14   Doc. 6-2. ¶ 4.)  Sierra Internet provides broadband Internet service to customers in Sierra

15   Telephone's service territory by purchasing access to Sierra Telephone's infrastructure network.

16   (*Id*.)  Both Sierra Telephone and Sierra Internet are wholly owned by Sierra Tel Communications

17   Group.  (Doc. 6-2 ¶ 4.)  Defendants are the five Commissioners of the California Public Utilities

18   Commission ("CPUC").  (Doc. 1 ¶ 8.)  The CPUC runs a subsidy program called the California

19   High-Cost Fund-A Administrative Committee Fund subsidy program ("A-Fund") and also

20   determines the rate design of telephone companies like Sierra Telephone. [2]  (Doc. 1 ¶ 8.) Sierra

21   Telephone is a participant in the A-Fund subsidy program.

22

23   [2] CPUC "fashions a rate design to provide the telephone company a fair opportunity to meet the
     revenue requirement." Cal. Pub. Util. Code § 275.6 (b)(4).  "Revenue requirement" in this context
24   "means the amount that is necessary for a telephone corporation to recover its reasonable
     expenses and tax liabilities and earn a reasonable rate of return."  *Id.* § 275.6 (b)(5). "Rate design"
25   in this context means the "mix of end user rates, high-cost support, and other revenue sources that
     are targeted to provide a fair opportunity to meet the revenue requirement of the telephone
26   corporation."  *Id.* § 275.6 (b)(3).  "Rate-of-return regulation" in this context "means a regulatory
     structure whereby the commission establishes a telephone corporation's revenue requirement, and
27   then fashions *a rate design* to provide the company a fair opportunity to meet the revenue
     requirement." *Id.* § 275.6(b)(4) (italics added.)
28

Here, Plaintiffs challenge the CPUC's policy which imputes the revenues of ISP affiliates, such as Sierra Internet, to the affiliate telephone company, such as Sierra Telephone, in determining the telephone company's rate design. *Id.* The parties term this policy "broadband imputation," and the Court adopts this terminology. Plaintiffs specifically challenge the CPUC's use of the broadband imputation policy in Sierra Telephone's rate design. (Doc. 1.) In particular, CPUC's application of the broadband imputation policy reduced the amount of subsidy Sierra Telephone receives from the A-Fund program by the amount of profits of the unregulated ISP affiliate Sierra Internet. (*Id.*)

Plaintiffs challenge the application of the broadband imputation policy, and thus, the reduction of A-Fund subsidy, in three claims. First, Plaintiffs allege that the imputation of Sierra Internet's profits in Sierra Telephone's rate design is an unconstitutional taking of both Sierra Telephone's and Sierra Internet's property. (*Id.* ¶ 66-79.) Second, Plaintiffs claim that the CPUC's rate design orders conflict with and are preempted by the Federal Communications Commission's ("FCC") Restoring Internet Freedom Order. (*Id.* ¶ 80-83.) Finally, Plaintiffs contend that the CPUC's rate design orders are in violation of the Dormant Commerce Clause given the "inherently interstate" nature of Sierra Internet's services. (*Id.* ¶ 84-90.)

**B. The A-Fund Subsidy Program**

Plaintiffs challenge the amount Sierra Telephone receives from the A-Fund subsidy program. (Doc. 1.) The A-Fund program provides subsidies to small rural telephone companies such as Sierra Telephone. Cal. Pub. Util. Code § 275.6. A-Fund subsidies offset the high cost of serving rural areas and ensure that rural Californians have access to affordable communication services. *Id.* § 275.6(a). The statute defines the program as providing "universal service rate support from the [A-Fund] program to small independent telephone corporations in an amount sufficient to supply the portion of the [A-Fund] revenue requirement that cannot reasonably be provided by the customers of each small independent telephone corporation after receipt of federal universal service rate support." *Id.* § 275.6(c). The statute also ensures "that support is not excessive so that the burden on all contributors to the [A-Fund] program is limited." *Id.* § 275.6(c). In short, the CPUC provides A-Fund monetary subsidies to regulated small rural

independent telephone corporations, such as Sierra Telephone, without over-subsidizing those entities. *Id*. § 275.6(c)-(d).

### C. CPUC Broadband Imputation Policy

In responding to changes in federal subsidy programs and balancing the subsidization of small rural telephone companies, the CPUC instituted its broadband imputation policy. *Ord. Instituting Rulemaking into the Rev. of the California High Cost Fund-A Program*, Decision No. 21-04-005, 2021 WL 1688437 at *14 (Cal. PUC Apr. 15, 2021) ("*Broadband Imputation Policy Decision*"). The broadband imputation policy requires that, if a small rural telephone company like Sierra Telephone has a broadband affiliate such as Sierra Internet, the CPUC will impute a portion of the affiliate's broadband revenue to the telephone company during the rate design process. *Id.* The broadband imputation policy states:

> *all reasonable positive retail broadband-related revenues of the [small rural telephone company] and its Internet service provider (ISP) affiliate* (if such affiliate exists) (but excluding revenues derived from areas outside of the [small rural telephone company's] telephone service territory and revenues resulting from alternative service platforms that are not based upon the [small rural telephone company's] local exchange facilities) net of all reasonable broadband-related expenses of the [small rural telephone company] and its ISP affiliate (if such affiliate exists) for the calendar year immediately preceding the filing of the GRC [general rate case] application *shall be imputed in the determination of rate design and California High Cost Fund-A support*.

*Id.* (italics added.) Because the A-Fund subsidy program supports infrastructure that both regulated telephone services, such as Sierra Telephone, and unregulated broadband ISP affiliates, such as Sierra Internet, share in the same territory, broadband imputation accounts for the broadband-related revenues generated from the common infrastructure. *Id.* at *1.

Imputing the unregulated ISP affiliate's, such as Sierra Internet's, broadband revenues generally decreases the amount of the A-Fund subsidy to the regulated telephone service, such as Sierra Telephone. During ratemaking cases which determine the regulated telephone company's rates and subsidies, each small rural telephone company submits a financial statement detailing the "broadband-related revenues and expenses" of the company and any ISP affiliate. *Id.* at *10. A portion of the profits from the small rural telephone companies and their ISP affiliates are then

1    incorporated into the "determination of rate design and [A-Fund] support" and "each dollar

2    increase in the broadband imputation amount result[s] in a corresponding dollar decrease in [A-

3    Fund] support." *Id.* at *12, *14. Thus, as in this case, the amount of the A-Fund subsidy to Sierra

4    Telephone is decreased by the portion of profits from the broadband affiliate, Sierra Internet, for

5    Sierra Internet's use of the common infrastructure.

6    **D. State Court Broadband Imputation Challenge**

7    In an original action filed in the Fifth District Court of Appeal, several small rural

8    telephone companies, including Sierra Telephone, challenged the CPUC's initial *Broadband*

9    *Imputation Policy Decision*, Decision No. 21-04-005 (Cal. PUC Apr. 15, 2021) instituting the

10   broadband imputation policy. *See Calaveras Tel. Co. v. Pub. Utilities Com*., 304 Cal. Rptr. 3d

11   261 (Ct. App. 2022), as modified on denial of reh'g (Jan. 18, 2023), review denied (Apr. 26,

12   2023). The parties challenged the CPUC's decision on the basis that it "(1) is not authorized by

13   section 275.6, (2) exceeds the authority granted to the [CPUC] by other statutes and the California

14   Constitution, (3) is preempted by federal law, and (4) is an unconstitutional taking of private

15   property." *Id*. at 265.

16   On December 20, 2022, the California Court of Appeal held that the CPUC had the

17   statutory authority to impute affiliates' broadband ISP affiliate revenues because the California

18   legislature granted specific authority for CPUC to consider broadband revenues in determining A-

19   Fund subsidies. *Id.* at 275. The Court of Appeal next found that the broadband imputation policy

20   did not regulate the ISP affiliates and concluded "that how the common owners and ISP affiliates

21   actually or might react to broadband imputation… does not convert the Commission regulations

22   of rates and subsidies for telephone services into the regulation of Internet access services for

23   purposes of federal preemption analysis." *Id*. Finally, the Court of Appeal found the plaintiffs'

24   taking claim unripe as the CPUC had not yet established a telephone company's rate design or A-

25   Fund subsidy. *Id*.

26   **E. CPUC's Sierra Telephone Decision**

27   On January 12, 2023, the CPUC issued its decision on rate design for Sierra Telephone,

28   one of the decisions that Plaintiffs now challenge. *Decision Approving Revenue Requirement,*

1    *Rate Design, and Selected Rates for the Sierra Telephone Co. for Test Year 2023*, Decision No.

2    23-01-004, 2023 WL 345669 (Cal. PUC Jan. 12, 2023) ("*Sierra Rate Design Decision*").  In this

3    decision, the CPUC applied its broadband imputation policy to examine Sierra Telephone's and

4    Sierra Internet's profits for the preceding calendar year and found Sierra Telephone's net positive

5    broadband revenue imputation was $1,110,392 and reduced the A-Fund draw by that amount.  *Id.*

6    at *14, *28.  The CPUC also found that the total revenue requirement for Sierra Telephone's

7    costs of service was $20,162,135.  *Id.*  at *28.  Having reduced the A-Fund draw by Sierra

8    Internet's broadband profits, Sierra Telephone's A-Fund draw was determined to be $7,225,106.

9    *Id.*  As a result of the order, the broadband imputation elements of the rate design took immediate

10    effect.  *Id.*  at *27.

11          Following Sierra Telephone's application for a rehearing, on June 30, 2023, the CPUC

12    issued an order denying rehearing, making the *Sierra Rate Design Decision* the CPUC's final

13    decision.  *Order Denying Rehearing of Decision 23-01-004*, Decision No. 23-06-058 (Cal. PUC

14    June 30, 2023); (Doc. 6-1 at 59-73.) [3]

15          **F.  Procedural History**

16          On August 1, 2023, Plaintiffs filed their complaint against Defendants, seeking

17    declaratory and injunctive relief on claims of (1) unconstitutional taking of Sierra Telephone's

18    property without just compensation; (2) unconstitutional taking of Sierra Internet's property

19    without just compensation; (3) preemption under the Supremacy Clause and the FCC's Restoring

20    Internet Freedom Order; and (4) violation of the Dormant Commerce Clause.  (Doc. 1.)  On

21    August 1, 2023, Plaintiffs also filed a Motion for Preliminary Injunction to enjoin Defendants

22    from further implementing, enforcing, and effectuating the broadband imputation elements of the

23    CPUC's Ratemaking Decisions.  (Doc. 6.)  Defendants filed an opposition to Plaintiffs' Motion

24    for Preliminary Injunction on August 15, 2023.  (Doc. 15.)  Plaintiffs filed their reply to the

25    opposition on August 25, 2023.  (Doc. 20.)

26          On August 22, 2023, Defendants filed a motion to dismiss Plaintiffs' claims under Federal

27    _____

28    [3] For ease of reference, the CPUC's challenged Decision No. 23-01-004 and Decision No. 23-06-058 regarding Sierra Telephone will be collectively referred to as the "Ratemaking Decisions."

1  Rule of Civil Procedure 12(b)(6).  (Doc. 17.)  Plaintiffs filed their opposition to Defendants'

2  motion to dismiss on September 5, 2023.  (Doc. 23.)  Defendants filed their reply to Plaintiffs'

3  opposition on September 12, 2023.  (Doc. 24.)  On September 27, 2023, the Court held a hearing

4  on the parties' motions.  (Doc. 27.)  On October 13, 2023, the parties filed supplemental briefs on

5  the issue of jurisdiction.  (Docs. 29-30.)

6         Both Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss

7  have substantively similar arguments and overlapping issues.  Therefore, the parties' positions

8  will be addressed collectively below.

9  **II.       REQUEST FOR JUDICIAL NOTICE**

10         In support of their motion to dismiss, Defendants ask the Court to take judicial notice of

11  pleadings filed in the state court writ proceeding, *Calaveras Telephone Company v. Public*

12  *Utilities Commission* (Case No. F083339): (1) Petition for Writ of Review of California Public

13  Utilities Commission Decisions 21-04-005 and 21-08-042, Case No. F083339, filed on

14  September 22, 2021 (Doc. 16 at 4-106, Attachment A); (2) the CPUC's Answer to the Petition for

15  Writ of Review, filed on November 19, 2021 (Doc. 16 at 107-190, Attachment B); (3) petitioners'

16  Reply in Support of the Petition for Writ of Review, filed on January 4, 2022 (Doc. 16 at 191-

17  264, Attachment C).  (Doc. 16.)  Plaintiffs do not oppose this request.  (*See* Docs. 20, 23.)

18         Requests for Judicial Notice Nos. 1-3 are complaints and court filings.  Court records are

19  properly subject to judicial notice.  *See* Fed. R. Evid. 201(b) (court may take judicial notice of

20  fact that is not subject to reasonable dispute because it is (1) generally known within the trial

21  court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

22  accuracy cannot reasonably be questioned); *see also MGIC Indem. Co. v. Weisman*, 803 F.2d 500,

23  504 (9th Cir. 1986); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980); *Pierce v. Cantil-*

24  *Sakauye*, No. C 13-01295 JSW, 2013 WL 4382735, at *3 (N.D. Cal. Aug. 13, 2013), aff'd, 628 F.

25  App'x 548 (9th Cir. 2016) ("On a motion to dismiss pursuant to either Rule 12(b)(1) or Rule

26  12(b)(6), the Court may take judicial notice of court records in other cases.").  Accordingly,

27  Defendants' Requests for Judicial Notice Nos. 1-3 are GRANTED.

28  ///

1      **III.**     **LEGAL STANDARD FOR PRELIMINARY INJUNCTION**

2        "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

3 *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  A preliminary injunction

4 represents the exercise of a far reaching power not to be indulged except in a case clearly

5 warranting it.  *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964).  "A

6 plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits,

7 that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

8 equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20 (citations

9 omitted). An injunction may only be awarded upon a clear showing that the plaintiff is entitled to

10 relief.  *Id.* at 22 (citation omitted).

11      **IV.**     **LEGAL STANDARD FOR MOTION TO DISMISS**

12        A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim, and

13 dismissal is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts

14 alleged under a cognizable legal theory.  *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42

15 (9th Cir. 2011) (quotation marks and citations omitted).  To survive a motion to dismiss, a

16 complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible

17 on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*,

18 550 U.S. 544, 555 (2007)) (quotation marks omitted); *Conservation Force*, 646 F.3d at 1242;

19 *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).  "A claim has facial plausibility

20 when the plaintiff pleads factual content that allows the court to draw the reasonable inference

21 that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. While the

22 plausibility requirement is not akin to a probability requirement, it demands more than "a sheer

23 possibility that a defendant has acted unlawfully."  *Id.*  This plausibility inquiry is "a context-

24 specific task that requires the reviewing court to draw on its judicial experience and common

25 sense." *Id.* at 679.

26        In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),

27 the court must accept as true the factual allegations of the complaint in question, *Erickson v.*

28 *Pardus*, 551 U.S. 89, 94 (2007), and construe the pleading in the light most favorable to the

plaintiff.  *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *Meek v. Cty. of Riverside*, 183 F.3d 962, 965 (9th Cir. 1999).  However, the court need not credit "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *See Twombly*, 550 U.S. at 555.  The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Seven Arts Filmed Entm't. Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013).

In ruling on a motion to dismiss, a court may only consider the complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201. *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

If a complaint fails to state a plausible claim, "[a] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

## V.    DISCUSSION

Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss both test the four central claims in Plaintiffs' complaint: (1) an unconstitutional taking of Sierra Telephone's property without just compensation pursuant to the Fifth Amendment and 42 U.S.C. § 1983; (2) an unconstitutional taking of Sierra Internet's property without just compensation pursuant to the Fifth Amendment and 42 U.S.C. § 1983; (3) preemption under the United States Constitution Supremacy Clause and FCC's Restoring Internet Freedom Order; and (4) a violation of the Dormant Commerce Clause.  (Docs. 1, 6, 17.)

As a threshold concern, the Court must ensure that it has jurisdiction over this matter and these claims.  At oral argument, the Court raised whether the Johnson Act barred Plaintiffs' claims.  (Doc. 31 at 6:3-10:22.)  The parties subsequently submitted briefing on the issue.  (Docs. 29-30.)

///

The Johnson Act requires that district courts "shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
>
> (2) The order does not interfere with interstate commerce; and,
>
> (3) The order has been made after reasonable notice and hearing; and,
>
> (4) A plain, speedy and efficient remedy may be had in the courts of such State."

28 U.S.C. § 1342. The Ninth Circuit construes the Johnson Act as precluding "federal court jurisdiction over all suits affecting state-approved utility rates, including actions seeking declaratory relief and compensatory damages." *Abcarian v. Levine*, 972 F.3d 1019, 1030 (9th Cir. 2020). The Johnson Act deprives the district court of subject matter jurisdiction if each of the four conditions is satisfied. *Id.*

In this case, Plaintiffs challenge a decision from the state's rate-making body and allege that the case is "grounded in constitutional doctrines stemming from the Fifth and Fourteenth Amendments, the Supremacy Clause, and the Commerce Clause of the United States Constitution." (Doc. 1 ¶ 9.) The Ninth Circuit, however, has expressly held that, "although a challenge to a rate order based on preemption may be regarded as constitutional for some purposes, it provides no basis for invoking the Johnson Act to deprive the district court of jurisdiction under the circumstances of this case." *Int'l Bhd. of Elec. Workers, Loc. Union No. 1245 v. Pub. Serv. Comm'n of Nevada*, 614 F.2d 206, 210–11 (9th Cir. 1980). Given Plaintiffs' preemption claim, jurisdiction is not based solely on diversity of citizenship or repugnance of the CPUC's orders to the Federal Constitution. The Court, therefore, has jurisdiction over this action.

Defendants urge the Court to apply the Johnson Act on a claim-by-claim basis. (Doc. 29.) Defendants argue that the Court lacks jurisdiction over the takings claim, but nonetheless maintains jurisdiction over the preemption claim. (*Id*. at 4.) However, Defendants acknowledge that the Ninth Circuit has declined to decide "whether the Johnson Act should be applied on a

claim-by-claim basis." *Abcarian*, 972 F.3d at 1030–31.  As the Ninth Circuit has not decided that the Johnson Act should be applied on a claim-by-claim basis, and Plaintiffs' preemption claim is not solely constitutional, the Court concludes that it has jurisdiction over all of Plaintiffs' claims.

The Court now turns to the parties' motions.  Because both the motion for preliminary injunction and motion to dismiss require the Court to assess the claims for the likelihood of success on the merits and for plausibility on their face, the Court addresses both motions together.

## A.  Fifth Amendment Takings Claim - Sierra Telephone's Property

In the first claim, Plaintiffs allege that Sierra Telephone is subjected to an unreasonable public utility rate structure that denies sufficient revenue for operating expenses and the capital costs of the business, which constitutes a takings.  (Doc. 1 ¶ 69.)  The CPUC estimates that Sierra Telephone required $20,162,135 for its costs of services as a public utility.  (*Id.* ¶ 70.)  However, the CPUC only provided $19,051,743 in revenue because the CPUC "imputed" Sierra Internet's profit to Sierra Telephone, producing a revenue shortfall for Sierra Telephone of approximately $1,110,392.  (*Id.*)  Plaintiffs argue that this revenue shortfall constitutes an unconstitutional taking of Sierra Telephone's property that will be replicated until at least 2028.  *Id.*; (Doc. 20 at 6) ("Because the 'total effect' of the rate order does not supply sufficient revenue for Sierra's public utility operations, there is a high likelihood of success on the takings claim.")

Defendants, in turn, argue that broadband imputation is consistent with the principles set forth by the Supreme Court.  (Doc. 17 at 15.)  Defendants further argue that Plaintiffs have no protected property right because participation in the A-Fund program is voluntary.  (*Id.* at 16.)  Defendants also argue that because the A-Fund is a voluntary program, Sierra Telephone is not required to participate in the A-Fund, and the state is not compelling a loss.  (*Id.* at 15-16.)

## Legal Standard for Takings Claims

"The Fifth Amendment's Takings Clause prohibits the taking of 'private property ... for public use, without just compensation.'"  *Sierra Med. Servs. Alliance v. Kent*, 883 F.3d 1216, 1223 (9th Cir. 2018) (quoting U.S. Const. amend. V).  To assert a valid property interest, the claiming party must have more than either a "unilateral expectation" or an "abstract need or desire" for the claimed interest; rather, the party must legitimately claim entitlement to the benefit

11

1    conferred.  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  A legitimate claim of entitlement,

2    which does qualify as a protected property interest, must be distinguished from such a unilateral

3    expectation that does not merit protection.  *Id.*

4          <u>**Sierra Telephone Does Not Demonstrate a Property Interest**</u>

5          In their complaint, Plaintiffs do not precisely define Sierra Telephone's property right, but

6    allege that "Sierra [Telephone] is a private corporation that holds private property and has a

7    vested property right in the revenues that it derives from operating its telephone system."  (Doc. 1

8    ¶ 68.)  Plaintiffs further allege that, as a "public utility, Sierra's rates are determined by the

9    CPUC, but this status does not diminish its constitutional rights to be free from government

10   confiscations of property without just compensation."  (*Id.*)  Plaintiffs contend that public rate

11   structures are unconstitutionally confiscatory if the rate structure does not afford sufficient

12   compensation.  (*Id.*)  On the other hand, Defendants argue that Plaintiffs do not have a property

13   interest as Sierra Telephone chose to participate in the voluntary A-Fund program, which has

14   conditions defined by state law.  (Doc. 17 at 14-16.)

15         The Ninth Circuit has distinguished between voluntary and mandatory government

16   programs in evaluating constitutional claims.  *See Managed Pharmacy Care v. Sebelius*, 716 F.3d

17   1235, 1241 (9th Cir. 2013) ("none of the Plaintiffs has a viable takings claim because Medicaid,

18   as a voluntary program, does not create property rights.").  In a similar case, but assessing a

19   subsidy program on a preemption claim, the Ninth Circuit recently examined the modification of

20   the CPUC's voluntary California LifeLine subsidy program.  *National Lifeline Assn v. Batjer*, No.

21   21-15969, 2023 WL 1281676, at *1 (9th Cir. Jan. 31, 2023).  In *National Lifeline*, the CPUC

22   administered a subsidy program that subsidized costs for participating wireless carriers.  *Id.*  The

23   CPUC implemented a rule that precluded California LifeLine participants from charging low-

24   income customers a co-pay for two affordable wireless plans, which the plaintiff challenged.  *Id.*

25   The Ninth Circuit noted that the CPUC rule "applies only to those that desire a state subsidy" and

26   that "service providers may forgo the state subsidy and set their own rates if they do not wish to

27   comply with the rule's conditions."  *Id.*  at *4.  The Ninth Circuit emphasized that such a rule

28   "does not directly control—and thus does not impermissibly regulate—the rates that providers

may set." *Id*.  Accordingly, the Ninth Circuit held that CPUC's rule was not rate regulation that could be preempted by a federal statute because participation was "voluntary and service providers remain free to opt out and charge whatever rates they deem appropriate." *Id*.  Thus, where a subsidy program is voluntary, the CPUC rule applies only to those who desire a subsidy. *Id.*

Similarly, the A-Fund program is a voluntary subsidy program.  The A-Fund program does not require participation, and Plaintiffs do not include factual allegations that participation in the A-Fund is mandatory.  (*See* Doc. 1.)

Rather, Plaintiffs allege that the "existence of [the A-Fund] program and the widespread participation amongst rural telephone companies reflects the reality that the high costs of service in rural areas require additional support to ensure that rates will remain affordable and investments in infrastructure will be sufficient."  (Doc. 1 ¶ 29.)  Plaintiffs further contend that, if "Sierra were to decline [A-Fund] support, the CPUC's ratemaking equation would require it to recover an additional $8,335,498 from its customers," which would "result in unsustainable losses in customers that would compromise its viability."  (Doc. 20 at 8.)

However, Plaintiffs do not allege that the CPUC is compelling Sierra Telephone's participation in the A-Fund.  As in *National Lifeline*, where a party participates in a voluntary subsidy program, the rules apply only to the companies which desire subsidies.  Because Plaintiffs have not shown that Sierra Telephone is required to participate in the A-Fund program, Plaintiffs fail to demonstrate an entitlement for Sierra Telephone.  Absent a mandatory program or entitlement, Sierra Telephone does not have a property interest in a government subsidy, given the voluntary nature of the A-Fund subsidy program.  Therefore, Sierra Telephone has not alleged a government taking.

### Sierra Telephone Does Not Establish that the Rate is Sufficiently "Unreasonable" to Constitute a Taking Under a *Hope* and *Duquesne Light* Theory

Even assuming Sierra Telephone has a property interest in the A-Fund program draw, the factual allegations do not support Plaintiffs' takings theory.  Plaintiffs principally argue that a rate structure may be unconstitutionally confiscatory if it does not afford sufficient compensation,

1   citing the Supreme Court's utility takings rulings in *Federal Power Commission v. Hope Natural*

2   *Gas Company*, 320 U.S. 591 (1944) and *Duquesne Light Company v. Barasch*, 488 U.S. 299

3   (1989).  (Doc. 1 ¶ 69.)  Defendants respond that the CPUC effectively balanced the interests of

4   the utility and the public in setting reasonable rates for Sierra Telephone.  (Doc. 17 at 15.)

5        In *Federal Power Commission v. Hope Nat. Gas Company*, where the Supreme Court

6   examined a rate order, the Court noted that "when the Commission's order is challenged in the

7   courts, the question is whether that order 'viewed in its entirety' meets the requirements of the

8   Act."  *Fed. Power Comm'n v. Hope Nat. Gas Co*., 320 U.S. 591, 602 (1944).  The Court noted

9   that, "regulation does not insure that the business shall produce net revenues," but that it remained

10  important for companies to have sufficient revenue for operating expenses and capital costs.  *Id.*

11  at 603.  The Court further cautioned that regulatory orders carry "a presumption of validity," and

12  that the burden is upon a challenger to make "a convincing showing that it is invalid because it is

13  unjust and unreasonable in its consequences."  *Id.*  The Court held that if "the total effect of the

14  rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an

15  end."  *Id.* at 603.  However, the Court did not precisely define what rates would be considered

16  "unjust" or "unreasonable."

17       Later, in *Duquesne Light Company v. Barasch*, the Supreme Court similarly examined

18  whether limits on a utility's rates were unconstitutional takings.  *Duquesne Light Co. v. Barasch*,

19  488 U.S. 299 (1989).  In *Duquesne Light*, the Court affirmed *Hope,* holding that if the regulatory

20  order is reasonable, it is unimportant that the process to reach that regulatory order may have been

21  flawed.  *Id.* at 310 (quoting *Hope*, 320 U.S. at 602).  In doing so, the Court did not set precise

22  guidelines, but held that the "Constitution within broad limits leaves the States free to decide

23  what ratesetting methodology best meets their needs in balancing the interests of the utility and

24  the public."  *Id.* at 316.

25       Pursuant to *Hope* and *Duquesne Light*, the Ratemaking Decisions reflect the CPUC

26  implementing a methodology to fashion a reasonable rate and balancing the interests of the utility

27  and public.  After years of study and public input, when instituting the broadband imputation

28  policy, the CPUC explained how it tailored the broadband imputation policy to exclude certain

1    revenues and permit companies "a fair opportunity to meet their revenue requirements."

2    *Broadband Imputation Policy Decision*, 2021 WL 3929845, at *7 (noting, for example, that

3    "broadband imputation does not apply to revenues derived from areas outside of the [small rural

4    telephone company's] telephone service territories or to revenues resulting from alternative

5    service platforms that are not based upon the [small rural telephone company's] local exchange

6    facilities… Nor are wholesale broadband revenues imputed.").  In that order, the CPUC

7    emphasized that, within "this framework [of Section 275.6], there are several objectives that

8    require the Commission to balance the interests of the utility, its ratepayers, and the statewide

9    contributors to the [A-Fund] program… the Commission's goals of accelerating broadband

10   deployment must also take into consideration and balance the directive that [A-Fund] support is

11   not excessive."  *Id*. at *13.  The CPUC's initial Broadband Imputation Policy Decision thus

12   shows how broadband imputation struck a balance between providing adequate support for

13   utilities and over-subsidizing a utility or its unregulated ISP affiliate.

14          In its order determining the rate design for Sierra Telephone, the CPUC noted that "the

15   public interest requires the CPUC to consider not only Sierra's ratepayers and customers, but the

16   interests of every carrier that contributes to the [A-Fund] from which Sierra is requesting

17   funding."  *Sierra Rate Design Decision*, 2023 WL 345669, at *19 (Jan. 12, 2023).  It is

18   undisputed that Sierra Internet uses Sierra Telephone's infrastructure to deliver broadband

19   services.  (Doc. 1 ¶ 7.)  The CPUC rate design, thus, accounts for Sierra Internet's usage of and

20   benefit derived from the subsidized infrastructure, by imputing some of Sierra Internet's profits to

21   Sierra Telephone.  *Id.*; *Sierra Rate Design Decision*, 2023 WL 345669, at *28; *see also*

22   *Broadband Imputation Policy Decision*, 2021 WL 1688437, at *1.  The CPUC's Ratemaking

23   Decisions balanced the public interest by considering Sierra Telephone and Sierra Internet, their

24   customers, and other carriers contributing to the A-Fund in its adopted rates.  *Sierra Rate Design*

25   *Decision*, 2023 WL 345669, at *28.  This process shows the CPUC used a methodology that

26   balances the interests of the utility and the public and accounts for Sierra Internet's use of Sierra

27   Telephone's regulated and subsidized infrastructure.  *Duquesne Light*, 488 U.S. at 316.  The

28   Court, therefore, at this juncture, cannot find the rate design "unfair" or "unreasonable."

15

1    Plaintiffs rely upon a figure from a 2016 CPUC decision to suggest that the rate of return

2    arrived at is unfair.  (*See* Doc. 1 ¶¶ 67-75.)  Plaintiffs emphasize that, based on a 2016 CPUC

3    decision, Sierra Telephone requires a 9.22% rate of return on regulated investments to cover its

4    costs of capital.  (Doc. 1 ¶ 70) (citing *Decision Determining the Cost of Capital for Ratemaking*

5    *Purposes for California's Independent Small Telephone Companies*, Decision No. 16-12-035,

6    2016 Cal. PUC LEXIS 706 at *2, *58 (Cal. PUC Dec. 15, 2016)).  Plaintiffs further allege that,

7    per the 2023 Ratemaking Decisions, Sierra Telephone is only able to earn a 5.98% rate of return,

8    which does not afford constitutionally sufficient compensation.  (Doc. 1 ¶ 71) (citing *Sierra Rate*

9    *Design Decision*, 2023 WL 345669, at *28)  Plaintiffs allege generally that the broadband

10   imputation policy created a "disconnect between Sierra's costs of service and its regulated

11   revenues that denies Sierra a fair opportunity to achieve its authorized rate of return, and which

12   undermines Sierra's ability to cover its operating expenses and impairs Sierra's capacity to earn

13   its authorized rate of return."  (*Id.* ¶ 72.)

14   Plaintiffs' allegations are primarily based upon CPUC estimates from a 2016 decision. But

15   Plaintiffs do not allege that the 9.22% rate of return remains the minimal rate of return for Sierra

16   Telephone's operations.  Because Plaintiffs do not include further factual allegations regarding

17   the impacts of the broadband imputation policy on Sierra Telephone's ability to achieve a

18   sufficient rate of return to draw investment and cover costs, they do not sufficiently allege a

19   takings claim.

20   Plaintiffs also provide evidence that the rate design with broadband imputation creates

21   further challenges for Sierra Telephone.  In support of Plaintiffs' Motion for Preliminary

22   Injunction, Sierra Telephone Vice President and General Manager Robert J. Griffin stated the

23   impacts of implementing the broadband imputation policy on Sierra Telephone include an

24   "intrastate revenue shortfall of $1,110,392 below the cost figure that Sierra must meet to fulfill its

25   service obligations to customers, continue investing in telecommunications network facilities, and

26   perform the day-to-day tasks that allow the business to function." (Doc. 6-2 ¶¶ 22-23.)  Mr.

27   Griffin further noted impacts from the lower A-Fund draw included difficulty in attracting capital

28   given a potential lower rate of return, constraints on cash flow, less cash availability to respond to

unexpected events such as wildfires, and an "enhanced risk of defaulting on loan obligations." (Doc. 6-2 ¶¶ 24-27.)

While these items may present challenges for Sierra Telephone, Plaintiffs have not alleged facts that show the CPUC's rate design causes Sierra Telephone to be unable to operate, or that the rate is otherwise unjust or unreasonable.  Accordingly, Sierra Telephone does not allege a takings claim under a *Hope* and *Duquesne Light* theory.

Plaintiffs further argue that for a rate structure to be constitutional, it must allow the utility to earn a return on the value of property equal to the return being made in the same general part of the country.  (Doc. 1 ¶ 22.)  In support, Plaintiffs cite a Supreme Court case in which the Court examined a rate order.  *See Bluefield Water Works & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 692–93 (1923) ("A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding, risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures.").

However, the Court in *Duquesne Light* incorporated *Bluefield Water Works* into its analysis regarding investor expectations, rather than viewing *Bluefield Water Works* as giving rise to a separate takings theory.  *Duquesne Light*, 488 U.S. at 313.  The Court noted that one "of the elements always relevant to setting the rate under *Hope* is the return investors expect given the risk of the enterprise." *Id*.  However, as discussed *supra*, Plaintiffs have not shown a taking pursuant to *Hope* and *Duquesne Light*.  Furthermore, Plaintiffs do not allege facts that compare Sierra Telephone's rate of return to other rates of return in the same territory.  *Bluefield Water Works*, 262 U.S. at 692–93.[4]  Therefore, *Bluefield Water Works* does not alone entitle Sierra Telephone to a certain rate of return and does not support Plaintiffs' takings theory.

///

---

[4] Plaintiffs emphasize the 9.22% rate of return based on a 2016 CPUC decision, but otherwise does not provide comparable rates of return.  (Doc. 1 ¶¶ 70-71.)

1    Accordingly, Plaintiffs do not sufficiently allege a taking of Sierra Telephone's property

2    under a *Hope* and *Duquesne Light* theory.

3    **Sierra Telephone's *Brooks-Scanlon* Takings Theory Also Fails as Plaintiffs Do Not**

4    **Allege Government Compulsion**

5    Plaintiffs further argue that the CPUC may not conflate utility and non-utility financials in

6    ratemaking calculations, citing the Supreme Court case *Brooks-Scanlon Company v. Railroad*

7    *Commission of Louisiana*.  (Doc. 1 ¶ 74; Doc. 6 at 17-18; Doc. 23 at 7.)  Defendants argue that

8    this citation is inapposite as *Brooks-Scanlon* instead dealt with whether a government agency

9    could compel an entity to operate at a loss.  (Doc. 17 at 15-16.)

10   The Supreme Court in *Brooks-Scanlon* held that the government could not compel an

11   entity to run a service at a loss.  *Brooks-Scanlon Co. v. R.R. Comm'n of Louisiana*, 251 U.S. 396

12   (1920).  In that case, a railroad commission order forced the plaintiff corporation to operate its

13   unregulated entity railroad at a loss.  *Id.* at 397-398.  The Court held that a "carrier cannot be

14   compelled to carry on even a branch of business at a loss, much less the whole business of

15   carriage." *Id.* at 399.  The Court reasoned that, though "plaintiff may be making money from its

16   sawmill and lumber business… it no more can be compelled to spend that than it can be

17   compelled to spend any other money to maintain a railroad for the benefit of others who do not

18   care to pay for it." *Id.*

19   Plaintiffs' *Brooks-Scanlon* takings theory fails because the CPUC's Ratemaking Decisions

20   regarding Sierra Telephone do not compel conduct.  The CPUC does not compel the regulated

21   Sierra Telephone to look to its affiliate Sierra Internet to recover its losses and does not compel

22   Sierra Telephone to participate in the A-Fund program.  *See Sierra Rate Design Decision*, 2023

23   WL 345669; *Broadband Imputation Policy Decision*, 2021 WL 1688437, at *1 ("This decision

24   does not regulate broadband Internet access service or the broadband rates charged by the [small

25   rural telephone companies] and their ISP affiliates, and it does not compel any entity to operate at

26   a loss. Instead, we act to appropriately account for broadband-related revenues and expenses

27   derived from the [small rural telephone companies'] facilities infrastructure that has substantially

28   benefited from [A-Fund] support by California ratepayers.").  Because the CPUC does not

1    compel any action from Sierra Telephone, Plaintiffs' *Brooks-Scanlon* takings theory fails.

2           Plaintiffs further argue that characterizing Sierra Telephone's participation in the A-Fund

3    as voluntary "ignores the practical role that the [A-Fund] plays in small independent telephone

4    companies' rate designs."  (Doc. 20 at 8.)  Plaintiffs argue that, if "Sierra were to decline [A-

5    Fund] support, the CPUC's ratemaking equation would require it to recover an additional

6    $8,335,498 from its customers."  *Id.*  Plaintiffs note that if "this amount were spread across

7    Sierra's customer base of approximately 15,300, basic voice service rates would increase by

8    approximately $45.00 per month, placing Sierra's residential and business basic rates at $71.50

9    and $88.25 per month, respectively," which would "result in unsustainable losses in customers

10   that would compromise its viability."  *Id*.  However, Plaintiffs do not allege that the CPUC is

11   compelling Sierra Telephone's participation in the A-Fund program or market.  The CPUC's

12   Ratemaking Decisions are therefore distinguishable from the railroad commission's compulsion

13   of the continued operation of a business in *Brooks-Scanlon*.  *See Brooks-Scanlon,* 251 U.S. at

14   399.  Plaintiffs' argument that Sierra Telephone's participation is involuntary therefore fails.

15          Accordingly, Plaintiffs have not alleged a taking under a *Brooks-Scanlon* theory.

16          **Plaintiffs Improperly Incorporate All Preceding Paragraphs in Their Takings Claim**

17          Sierra Telephone's takings claim further incorporates all 65 paragraphs that preceded it

18   without distinction.  (Doc. 1 ¶ 66.)  This is an improper shotgun pleading technique that does not

19   give proper notice to either the Defendants or the Court.  *See Weiland v. Palm Beach Cnty.*

20   *Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015); *Deerpoint Grp., Inc. v. Agrigenix, LLC*,

21   345 F.Supp.3d 1207, 1234 n.15 (E.D. Cal. 2018).  If specific paragraphs support a takings claim

22   and Plaintiffs intend to rely on, then those paragraphs, not the wholesale incorporation of every

23   paragraph, should be specifically incorporated by reference (e.g. "Plaintiffs incorporate

24   paragraphs 15-24, 27, 38 and 41-45 as if fully set forth herein.").

25          Having reviewed Plaintiffs' allegations and theories, Plaintiffs have not sufficiently

26   alleged a taking of Sierra Telephone's property.

27          **B.  Fifth Amendment Takings Claim – Sierra Internet's Property**

28          Plaintiffs next argue that broadband imputation mandates transfer of Sierra Internet's

1  profits to Sierra Telephone to fulfill Sierra Telephone's revenue requirement on an annual basis

2  and thus constitutes a *per se* taking.  (Doc. 1 ¶¶ 77-78.)  Plaintiffs contend that the reduction in

3  Sierra Telephone's revenues is equivalent to Sierra Internet's net profits, which shows the

4  CPUC's intent to compel Sierra Internet's ownership to contribute to Sierra Telephone's

5  regulated costs.  (Doc. 20 at 8-9; Doc. 23 at 8-9.)

6      Defendants respond that there is no *per se* taking as there is no government mandate

7  appropriating private property.  (Doc. 15 at 15-16.; Doc. 17 at 17-18.)  Defendants further

8  contend that there is no *per se* taking of Sierra Internet's property as the CPUC has not required

9  Sierra Internet to suffer a permanent physical invasion of their property nor has the government

10  completely deprived Sierra Internet of the beneficial use of its property.  (Doc. 17 at 17.)

11      **No *Per Se* Taking is Alleged as Plaintiffs Do Not Allege a Government-Mandated**

12      **Transfer**

13      The Supreme Court summarizes that *per se* takings involve scenarios "where government

14  requires an owner to suffer a permanent physical invasion of her property—however minor" or

15  where regulations "completely deprive an owner of 'all economically beneficial us[e]' of her

16  property." *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 538, (2005) (citing *Loretto v.

17  Teleprompter Manhattan CATV Corp*., 458 U.S. 419 (1982); *Lucas v. S.C. Coastal Council*, 505

18  U.S. 1003, 1019 (1992)).

19      Here, Plaintiffs do not allege that the CPUC has directly appropriated Sierra Internet's

20  private property or ousted Sierra Internet from its domain.  *See* (Doc. 1 ¶¶ 76-79); *Lingle*, 544

21  U.S. at 539 (2005) (describing "the classic taking in which government directly appropriates

22  private property or ousts the owner from his domain").  Plaintiffs also do not allege that the

23  CPUC has required a permanent physical invasion of Sierra Internet's property.  *See* (Doc. 1 ¶¶

24  76-79); *Loretto*, 458 U.S. at 441.  Nor do Plaintiffs allege that Sierra Internet is the "owner of real

25  property [who] has been called upon to sacrifice all economically beneficial uses in the name of

26  the common good, that is, to leave his property economically idle." *See* (Doc. 1 ¶¶ 76-79); *Lucas*,

27  505 at 1019.  Accordingly, Plaintiffs do not allege a taking under one of the traditional theories.

28      Plaintiffs, instead, argue that the Ratemaking Decisions indirectly mandate a transfer of

1  Sierra Internet's profits to Sierra Telephone to fulfill Sierra Telephone's revenue requirement on

2  an annual basis.  (Doc. 1 ¶ 78.)  Plaintiffs rely on *Brown v. Legal Foundation of Washington*, in

3  which the Supreme Court examined a state supreme court-created program involving an indirect

4  transfer of funds.  *See Brown v. Legal Found. of Washington*, 538 U.S. 216 (2003).  The program

5  in *Brown* required client funds that could not earn net interest for the clients be placed in an

6  IOLTA account which would pay the net interest to a charitable foundation.  *Id.*  at 224.  The

7  *Brown* plaintiffs alleged a government-mandated transfer occurred when they delivered funds to

8  limited practice officers who were required to deposit them in IOLTA bank accounts and then

9  direct the banks to pay interest to a charitable foundation, rather than to the owners of the

10  principal.  *Id.* at 224, 228.  The Court reasoned that because "the interest earned in the IOLTA

11  accounts 'is the 'private property' of the owner of the principal,'" "the transfer of the interest to

12  the Foundation here seems more akin to the occupation of a small amount of rooftop space in

13  *Loretto*" and could thus constitute a *per se* taking.  *Id.*  at 235.

14       *Brown* does not support a *per se* taking theory here.  The mandated interest transfer in

15  *Brown* differs from this alleged indirect "transfer" because the CPUC does not mandate a transfer

16  from Sierra Internet to Sierra Telephone.  *See Sierra Rate Design Decision*, 2023 WL 345669.

17  While Plaintiffs cite the 2021 CPUC order instituting the broadband imputation policy as

18  implicitly acknowledging a required transfer, the order explicitly does not require a transfer.  The

19  order "neither requires the ISP affiliate to transfer funds to the [small rural telephone company]

20  nor takes any of the ISP affiliates' profits that the common owners would otherwise have absent

21  the subsidized benefits the ISP affiliates derive from [A-Fund] funding."  *Broadband Imputation*

22  *Policy Decision*, 2021 WL 1688437, at *8.  Thus, the CPUC's Ratemaking Decisions do not

23  require transfer of Sierra Internet's profits to Sierra Telephone.  Because Plaintiffs fail to allege

24  how imputing Sierra Internet's profits in Sierra Telephone's rate design mandates a transfer of

25  property, Plaintiffs' *Brown* takings theory is unavailing.

26       Plaintiffs further cite a California Court of Appeal case in which the CPUC allocated

27  proceeds from the redemption of stock to telephone company ratepayers.  (Doc. 1 ¶ 78) (citing

28  *The Ponderosa Tel. Co. v. Pub. Utilities Com.*, 197 Cal. App. 4th 48, 50 (2011)); (Doc. 6 at 18.)

1   However, Plaintiffs do not clarify how the stock proceeds allocation that constituted a taking in

2   that case is like the broadband imputation policy at issue here.  Furthermore, the Court will not

3   rely on nonbinding authority on this issue.

4          Having reviewed Plaintiffs' allegations and theories, Plaintiffs have not sufficiently

5   alleged a taking of Sierra Internet's property.

6          **C. Preemption**

7          Plaintiffs' third claim contends that the CPUC's Ratemaking Decisions regarding Sierra

8   Telephone are preempted by the FCC's Restoring Internet Freedom Order.  (Doc. 1 ¶¶ 80-83.)

9   Plaintiffs argue that by subjecting Sierra Internet to a regulatory audit, reasonableness review, and

10  participation in discovery as part of Sierra Telephone's rate case, the Ratemaking Decisions

11  conflict with the FCC's determinations that ISPs must be free of public-utility style regulation.

12  (Doc. 1 ¶ 82; Doc. 6 at 18-19; Doc. 23 at 9-10.)

13         Defendants, in turn, contend that Plaintiffs' preemption claim fails because: it was

14  precluded by the *Calaveras* action; the FCC's Restoring Internet Freedom Order, which

15  deregulated broadband service, is insufficient to preempt state law; and the CPUC may impose

16  greater conditions on participation because the A-Fund program is a voluntary subsidy fund.

17  (Doc. 17.)

18         **Legal Standard for Preemption**

19         The Supremacy Clause of the United States Constitution mandates that "the Laws of the

20  United States ... shall be the supreme Law of the Land; and the Judges in every State shall be

21  bound thereby, any Thing in the Constitution or Laws of any State to the Contrary

22  notwithstanding." U.S. Const. art. VI, cl. 2.  The Supremacy Clause "invalidates state laws that

23  interfere with, or are contrary to, federal law."  *Moldo v. Matsco, Inc.* (*In re Cybernetic Servs.*),

24  252 F.3d 1039, 1045 (9th Cir. 2001) (internal citations omitted).  Whether federal law preempts

25  state law is governed by congressional intent.  *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d

26  928, 941 (9th Cir. 2002). The Supreme Court has established a general framework by which

27  preemption questions are analyzed:

28         [S]tate law can be preempted in either of two general ways.  If

Congress evidences an intent to occupy a given field, any state law falling within that field is preempted. If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248 (1984) (internal citations omitted).

**Plaintiffs' Preemption Claim Fails Because an FCC Policy Preference Does Not Preempt the Ratemaking Decisions**

The Ninth Circuit recently examined the Restoring Internet Freedom Order and held that state law cannot be preempted by a federal policy preference. *ACA Connects-America's Communication's Ass'n v. Bonta*, 24 F.4th 1233, 1241 (9th Cir. 2022). In *ACA Connects*, the Ninth Circuit considered whether a preemption directive related to the FCC's 2018 reclassification of broadband services as Title I information services and eliminating Title II federal net neutrality rules preempted state net neutrality rules. *Id*. In *ACA Connects*, plaintiffs argued that because the FCC based its "reclassification decision in reliance on its policy judgment that a light-touch regulatory framework would be most effective," the FCC order would be preemptive of state law which impacted broadband providers. *Id.* at 1243. The Ninth Circuit held to the contrary that the FCC's policy preferences cannot "preempt state action in the absence of federal statutory regulatory authority" and "warned that to permit preemption on the basis of policy rather than legislation would allow a federal agency to confer power upon itself and override the power of Congress." *Id.* (citing *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357, 374-375 (1986) ("an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it.")).

As with the *ACA Connects* plaintiffs, Plaintiffs' preemption argument similarly fails. At oral argument, Plaintiffs reconfirmed their position that FCC's Restoring Internet Freedom Order is preemptive of the Ratemaking Decisions. (Doc. 31 at 21:5-13.) Plaintiffs rely on the FCC's policy preference, the Restoring Internet Freedom Order, rather than citing to federal statutory authority for preemptive force. (Doc. 1 ¶ 82.) The Restoring Internet Freedom Order demonstrates the FCC's preference for a "light-touch" broadband regulatory approach, *see*

23

1   *Restoring Internet Freedom*, 33 FCC Rcd. 311, *318, *374 (F.C.C. Jan. 4, 2018); but the

2   Restoring Internet Freedom Order is merely a policy preference.  Because Plaintiffs cannot

3   demonstrate any conflicting federal statutory authority and only point to a policy preference, they

4   have not shown that the Ratemaking Decisions' broadband imputation conflicts with federal law

5   or conflicts with the purposes and objectives of Congress.  *See ACA Connects*, 24 F.4th at 1243

6   ("the Supreme Court has expressly rejected the argument that an agency's policy preferences can

7   preempt state action in the absence of federal statutory regulatory authority").

8           Plaintiffs further argue that the FCC policy may still preempt the CPUC's actions, citing a

9   New York District Court decision.  *See N.Y. State Telecomms. Ass'n v. James*, 544 F.Supp.3d

10  269, 274 (E.D.N.Y. 2021).  However, the Court will not rely on out-of-circuit, nonbinding

11  authority on this issue.

12          Defendants argue that Plaintiffs' pre-emption claim fails for another reason.  Defendants

13  contend that because the A-Fund program is a voluntary subsidy program, the CPUC may place

14  conditions on participation in such programs that it could not otherwise mandate.  (Doc. 17 at 24-

15  25.)  In support, Defendants cite the recent Ninth Circuit decision in *National Lifeline*

16  *Association.  National Lifeline Assn*, 2023 WL 1281676.  In *National Lifeline*, an industry trade

17  association for wireless carriers sued regarding a CPUC rule which increased mobile service plan

18  requirements without a corresponding increase in the subsidy amount, arguing that the rule was

19  preempted by Section 332(c)(3)(A) of the Communications Act of 1934.  *Id.*  The Ninth Circuit

20  held that the CPUC rule "applies only to those that desire a state subsidy."  *Id.* at *4.  The rate

21  regulation was therefore not preempted by federal law because participation was "voluntary and

22  service providers remain free to opt out and charge whatever rates they deem appropriate."  *Id.*

23          Here, the CPUC has noted that broadband imputation "neither requires the ISP affiliate to

24  transfer funds to the [small rural telephone company] nor takes any of the ISP affiliates' profits

25  that the common owners would otherwise have absent the subsidized benefits the ISP affiliates

26  derive from [A-Fund] funding."  *Broadband Imputation Policy Decision*, 2021 WL 3929845, at

27  *8.  As with *National Lifeline*, broadband imputation applies only to those who desire a state

28  subsidy and does not compel participation in the subsidy program.  Because the A-Fund program

is voluntary, it is therefore not preempted by the FCC policy.

Accordingly, Plaintiffs have not sufficiently alleged preemption of the CPUC's Ratemaking Decisions.

**Plaintiffs' Preemption Claim is Not Claim Precluded**

Defendants further argue that Plaintiffs' preemption claim is precluded based upon the *Calaveras* action.  (Doc. 17 at 19-21.)  Defendants contend that Plaintiffs were parties to that action and the California Court of Appeal already considered whether broadband imputation constitutes an economic or public utility regulation.  (*Id.* at 19.)  Plaintiffs respond that the *Calaveras* facial challenge did not present the same issue as the present "as applied" challenge, and the *Calaveras* action involved different CPUC decisions.  (Doc. 23 at 10.)

"Res judicata"—otherwise known as claim preclusion—"is applicable whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (internal quotation marks omitted); *Pollock v. Univ. of S. California*, 112 Cal. App. 4th 1416, 1427 (2003) ("The doctrine of res judicata—or claim preclusion—adheres when (1) the issues decided in the prior adjudication are identical with those presented in the later action; (2) there was a final judgment on the merits in the prior action; and (3) the party against whom the plea is raised was a party or was in privity with a party to the prior adjudication.")  "Res judicata bars the relitigation not only of claims that were conclusively determined in the first action, but also matter that was within the scope of the action, related to the subject matter, and relevant to the issues so that it could have been raised."  *Burdette v. Carrier Corp*., 71 Cal. Rptr. 3d 185, 191 (2008), as modified on denial of reh'g (Feb. 14, 2008); *Thibodeau v. Crum*, 6 Cal. Rptr. 2d 27, 29 (1992) ("If the matter was within the scope of the action, related to the subject-matter and relevant to the issues, so that it could have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.")

The Ninth Circuit has noted that, "[o]ften, an as-applied challenge will not be precluded by an earlier facial challenge because the 'transactional nucleus of facts' surrounding the enactment of a regulation will be different from the nucleus of facts involved when that regulation

1  is applied to a particular property." *Tahoe-Sierra*, 322 F.3d at 1080.  Thus, an as-applied

2  challenge is not the same as a factual challenge.

3      Here, the petitioners in *Calaveras* raised similar constitutional challenges based upon the

4  same harm petitioners suffered because of broadband imputation.  *Calaveras*, 304 Cal. Rptr. 3d at

5  265 (challenging broadband imputation on the basis that it "(1) is not authorized by section 275.6,

6  (2) exceeds the authority granted to the Commission by other statutes and the California

7  Constitution, (3) is preempted by federal law, and (4) is an unconstitutional taking of private

8  property.").  But Plaintiffs' current as-applied challenge includes facts specific to Sierra

9  Telephone's rate case, and the earlier case did not raise the specific effect of the broadband policy

10  on each petitioner.  *Id.*  Given that the transactional nucleus of facts of *Calaveras* differs from the

11  instant action, these actions are not identical.  *Tahoe-Sierra*, 322 F.3d at 1080.  Because the

12  actions are not identical, Plaintiffs' preemption claim is not precluded under res judicata.

13      **Plaintiffs' Preemption Claim is Not Issue Precluded**

14      Defendants further argue that Plaintiffs' preemption claim is issue precluded based upon

15  the *Calaveras* action, as Plaintiffs were parties to that action and the California Court of Appeal

16  already considered whether broadband imputation constitutes an economic or public utility

17  regulation.  (Doc. 17 at 22.)  Plaintiffs respond that the *Calaveras* facial challenge did not present

18  the same issue as the present "as applied" challenge, and the *Calaveras* action involved different

19  CPUC decisions.  (Doc. 23 at 10.)

20      "Issue preclusion… applies when: '(1) the issue necessarily decided at the previous

21  proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended

22  with a final judgment on the merits; and (3) the party against whom [issue preclusion] is asserted

23  was a party or in privity with a party at the first proceeding.'"  *Paulo v. Holder*, 669 F.3d 911,

24  917 (9th Cir. 2011); *Kelly v. Vons Companies, Inc*., 79 Cal. Rptr. 2d 763, 769 (1998) ("A prior

25  determination by a tribunal will be given collateral estoppel effect when (1) the issue is identical

26  to that decided in a former proceeding; (2) the issue was actually litigated and (3) necessarily

27  decided; (4) the doctrine is asserted against a party to the former action or one who was in privity

28  with such a party; and (5) the former decision is final and was made on the merits.")

Under California law, "[t]he 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." *Hernandez v. City of Pomona*, 46 Cal. 4th 501 (2009) (citation omitted); *Hardwick v. Cty. of Orange*, 980 F.3d 733, 740 (9th Cir. 2020) (same). The petitioners in *Calaveras* raised the issue of "whether broadband imputation constitutes an economic or public utility type regulation of the ISP affiliate" whereas Plaintiffs now raise the issue of whether the CPUC's Ratemaking Decisions conflict with the FCC's determinations. *Calaveras*, 304 Cal. Rptr. 3d at 275. As a result, the factual basis of the actions are different, as *Calaveras* was a facial challenge of the broadband imputation policy, whereas here, Plaintiffs dispute the application of broadband imputation on Sierra Internet and allege facts specific to the Ratemaking Decisions. Because the two actions do not have identical factual allegations, Plaintiffs' preemption claim may not be issue precluded by the *Calaveras* action.

### D. Dormant Commerce Clause Claim

For their fourth claim, Plaintiffs allege that the CPUC's application of the broadband imputation policy violates the Dormant Commerce Clause. Plaintiffs allege that because Sierra Internet's services "are inherently interstate in nature, so interference with or discrimination against these services necessarily burdens interstate commerce." (Doc. 1 ¶ 86.) Plaintiffs argue that the broadband imputation policy discriminates against Sierra Internet as it "only impacts ISPs that happen to be affiliated with rural telephone companies who participate in the [A-Fund] program." (*Id.*)

Defendants, in turn, argue that Plaintiffs' Dormant Commerce Clause claim fails as it is precluded by the *Calaveras* action, and per the requirements of the *Pike* line of Dormant Commerce Clause cases, discussed *infra*, Plaintiffs have not shown that the burden imposed on interstate commerce is excessive in relation to the putative local benefits. (Doc. 15 at 24-26.)

### Dormant Commerce Clause Legal Standard

Courts evaluate Dormant Commerce Clause challenges using a two-tiered analysis. *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578–79 (1986). At the first tier, a court determines whether "a state statute directly regulates or discriminates against

interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests." *Id*. at 579.  At the second tier, absent such discrimination, if "a statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  "State laws frequently survive this *Pike* scrutiny, though not always, as in *Pike* itself."  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008) (citations omitted).  The Supreme Court has also held that, where courts could not detect a disparate impact on out-of-state business, "any arguable burden does not exceed the public benefits of the ordinances," and therefore, the Dormant Commerce Clause claim failed.  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth*., 550 U.S. 330, 346-347 (2007).

**<u>Plaintiffs' Dormant Commerce Clause Claim Fails Because No Interstate Burden is Alleged</u>**

Plaintiffs make a *Pike* argument alleging that, because broadband services are inherently interstate in nature, interference with broadband services necessarily burdens interstate commerce.  (Doc. 1 ¶ 86); (Doc. 20 at 12.)  Plaintiffs further allege that ISPs, such as Sierra Internet, which are affiliates of A-Fund participants, such as Sierra Telephone, are disadvantaged in comparison with ISPs which are not affiliates of A-Fund participants.  (Doc. 1 ¶ 89.)  On the other hand, Defendants dispute that the Ratemaking Decisions' use of broadband imputation impacts interstate commerce and argue that Plaintiffs have not attempted to balance any burden with local benefits.  (Doc. 17 at 26-29.)

Plaintiffs do not appear to allege that there is a burden on interstate commerce.  Plaintiffs merely rely on Sierra Internet's broadband services as "inherently interstate," such that any "interference with or discrimination against these services necessarily burdens interstate commerce."  (Doc. 1 ¶¶ 86-87) (citing *Restoring Internet Freedom*, 33 FCC Rcd. at *429).  Sierra Telephone Vice President and General Manager Robert J. Griffin further provided evidence that the new rate design resulting from broadband imputation has caused Sierra Internet to consider increasing rates or cutting operational costs which could impact service quality, harm customers,

1   and keep Sierra Internet from investing in services or expanding its offerings.   (Doc. 6-2 ¶¶ 29-

2   30.)  This evidence focused on Sierra Internet's internal operations, but did not address any

3   impact on interstate commerce.

4          Beyond Plaintiffs' assumption that any burden on broadband services is a burden on

5   interstate commerce, Plaintiffs do not articulate how the disadvantages of broadband imputation

6   for Sierra Internet inflict a burden on interstate commerce.  There are no allegations of a disparate

7   impact on out-of-state businesses as opposed to in-state businesses.  *See United Haulers*, 550 U.S.

8   at 346-347.  Rather, all "burdens" are upon Sierra Internet's internal operations.  Because

9   Plaintiffs have not alleged a burden on interstate commerce and have not attempted to balance

10   any alleged burden with potential local benefit, Plaintiffs' Dormant Commerce Clause claim fails.

11   The Court rejects the argument that merely being involved in a service deemed "inherently

12   interstate in nature" results in a burden on interstate commerce, absent any such evidence.

13          **Plaintiffs' Dormant Commerce Clause Claims Are Not Precluded**

14          Defendants argue that Plaintiffs' Dormant Commerce Clause claims are precluded based

15   on the *Calaveras* action, as Plaintiffs' claims were within the scope of the *Calaveras* action and

16   should have been brought then.  (Doc. 17 at 26.)  Plaintiffs respond that the *Calaveras* facial

17   challenge did not encompass the present "as applied" challenge.  (Doc. 23 at 13-14.)

18          As discussed above, claim preclusion requires that the claims be identical.  *Tahoe-Sierra*,

19   322 F.3d at 1080 ("[o]ften, an as-applied challenge will not be precluded by an earlier facial

20   challenge because the 'transactional nucleus of facts' surrounding the enactment of a regulation

21   will be different from the nucleus of facts involved when that regulation is applied to a particular

22   property.").  Here, the *Calaveras* petitioners raised similar facial constitutional challenges based

23   upon the same harm from broadband imputation. *Calaveras,* 304 Cal. Rptr. 3d at 265.  But

24   Plaintiffs' as-applied challenge, in the instant case, includes facts specific to Sierra Telephone's

25   rate case, and the earlier case did not raise the specific effect of the broadband policy on each

26   petitioner.  *Id.*; (Doc. 1 ¶¶ 84-90).

27          Given that the transactional nucleus of facts of the *Calaveras* facial challenge differs from

28   the as applied challenge in the instant action, these actions are not identical.  *Tahoe-Sierra*, 322

1    F.3d at 1080.  Because the actions are not identical, Plaintiffs' Dormant Commerce Clause claims

2    are not precluded under res judicata.

3           **E.  Preliminary Injunction**

4           The Ninth Circuit has noted that interpretations of "likelihood of success on the merits"

5    includes "reasonable probability," "fair prospect," "substantial case on the merits," and "serious

6    legal questions ... raised." *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (citing *Leiva-*

7    *Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011)).  The Ninth Circuit clarified that these

8    interpretations all "indicate that, 'at a minimum,' a petitioner must show that there is a

9    'substantial case for relief on the merits.'"  *Id.* (citing *Leiva-Perez*, 640 F.3d at 968).  "The

10   standard does not require the petitioners to show that 'it is more likely than not that they will win

11   on the merits.'"  *Id.* (citing *Leiva-Perez*, 640 F.3d at 966).

12          Given that Plaintiffs have not alleged sufficient facts for their claims, Plaintiffs have not

13   met their burden to show a "likelihood of success on the merits."  Because Plaintiffs have not

14   shown a likelihood of success on the merits, it is unnecessary for the Court to address the other

15   requirements for prevailing on a motion for injunctive relief.

16          **F.  Motion to Dismiss**

17          To survive a motion to dismiss, a complaint must contain sufficient factual matter,

18   accepted as true, to state a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

19   (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (quotation marks

20   omitted); *Conservation Force*, 646 F.3d at 1242; *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969

21   (9th Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that

22   allows the court to draw the reasonable inference that the defendant is liable for the misconduct

23   alleged." *Iqbal,* 556 U.S. at 678.

24          Rule 15 provides that leave to amend "shall be freely given when justice so requires." Fed.

25   R. Civ. P. 15(a). The Ninth Circuit has held that "[t]his policy is to be applied with extreme

26   liberality."  *Eminence Capital, L.L.C. v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003)

27   (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)).

28   Generally, a "district court should grant leave to amend even if no request to amend the pleading

was made, unless it determines that the pleading could not possibly be cured by allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citation omitted).

As discussed above, Plaintiffs have not sufficiently included factual allegations as to their takings, preemption, and Dormant Commerce Clause claims.  Accordingly, Defendants' motion to dismiss shall be granted with leave to amend.

## VI.   CONCLUSION AND ORDER

For the reasons stated, IT IS ORDERED THAT:

1. Plaintiffs' Motion for Preliminary Injunction (Doc. 6) is DENIED;

2. Defendants' Motion to Dismiss (Doc. 17) is GRANTED in part and DENIED in part; and

3. Plaintiffs may file an amended complaint, consistent with this Order, not later than thirty (30) days from the electronic filing date of this Order. Defendants shall file a responsive pleading not later than twenty-one (21) days after Plaintiffs files an amended complaint.

IT IS SO ORDERED.

Dated:   __November 27, 2023__          ___/s/ Barbara A. McAuliffe___
                                        UNITED STATES MAGISTRATE JUDGE